IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PAUL A. GALLEGOS,

        Plaintiff,

vs.                                                                      No. CIV 03-746 LCS

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion to Reverse and Remand (Doc. 12), filed January 23, 2004. The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits. This matter comes before this Court pursuant to 28 U.S.C. § 636(c). The United States Magistrate Judge, having considered the Motion, briefs, administrative record, and applicable law, finds that this Motion is well-taken and should be **GRANTED**.

    1.      STANDARD OF REVIEW

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Sec'y of Health and Human Svcs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such relevant evidence that a reasonable mind might accept to support the conclusion. *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988). The decision of an Administrative Law Judge ("ALJ") is not supported by substantial evidence if the evidence supporting the decision is

overwhelmed by other evidence on the record. *Id*. at 805.

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of at least twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir.)(citing 42 U.S.C. § 423(d)(1)(A)). The Secretary has established a five-step process for evaluating a disability claim. *Bowen v. Yuckert*, 482 U.S. 137 (1987). At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulation under 20 C.F.R. Part 404, Subpart P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. *See Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir. 1988). At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity ("RFC"), age, education, and prior work experience. *See Gatson v. Bowen*, 838 F.2d 442, 448 (10th Cir. 1988).

## II.  PROCEDURAL HISTORY

Plaintiff, now 41 years old, filed his application for disability insurance benefits on April 16, 2001, alleging disability commencing on July 17, 2000. (R. at 53.) Plaintiff's alleged disability was due to pain in the low back with accompanying pain and numbness in the right leg and foot. (R. at 184.) Plaintiff has a GED and past relevant work as an electrician's assistant. (R. at 81-90.)

Plaintiff's application for disability insurance benefits was denied at the initial level on October 11, 2001 (R. at 32) and at the reconsideration level on February 8, 2002. (R. at 38.) Plaintiff retained attorney George Weeth to represent him on February 22, 2002 (R. at 27) and filed a Request for Hearing by Administrative Law Judge on February 25, 2002. (R. at 42.) The ALJ held a hearing on August 27, 2002. (R. at 272-299.) Plaintiff and Judith Beard, a vocational expert, testified at the hearing. (R. at 272.)

The ALJ issued his decision on October 16, 2002, analyzing Plaintiff's claim in accordance with the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993)(R. at 11.) At the first step of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset of his alleged disability. (R. at 14.) At the second step, the ALJ determined that Plaintiff had severe impairments consisting of degenerative disc disease in the lumbar spine and diabetes mellitus. (Id.) At step three of the analysis, the ALJ found that the severity of Plaintiff's impairments did not meet or equal any of the impairments found in the Listing of Impairments ("Listings"), Appendix I, Subpart P, 20 C.F.R. §§ 401.1501-1599. (Id.) The ALJ also found that Plaintiff was not fully credible regarding the extent of his impairments. (R. at 15.) At step four, the ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") to perform a limited range of light work. (R. at 18.) Based on this RFC, the ALJ determined that Plaintiff would not be able to perform any of his past relevant work. (Id.) At step five, the ALJ found that, based on his RFC, Plaintiff retained the ability to perform jobs in the regional and national economy and, as such, was not under a disability as defined in the Social Security Act. (R. at 19.)

Plaintiff filed a Request for Review of Hearing Decision on December 12, 2002. (R. at

21.) On April 23, 2003, the Appeals Council denied Plaintiff's request for review. (R. at 5-8.) Hence, the decision of the ALJ became the final decision of the Commissioner for purposes of judicial review. Plaintiff filed the present action on June 24, 2003 seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## III.  ANALYSIS AND FINDINGS

Plaintiff's back problems apparently stem from an injury sustained at work in July of 2000 when Plaintiff was thrown to the ground while handling a high pressure water hose. (R. at 126.) Plaintiff was seen at the emergency room of Presbyterian Hospital the day of this accident and on the following day. (Id.) Plaintiff was told he had sustained a soft tissue injury with no evidence of bone injury. (Id.) A CT scan was unremarkable and showed no evidence of kidney hematoma or retroperitoneal bleeding. (Id.)

Plaintiff saw Dr. John Baca several times after the accident for emergency room follow up. (Id.) As of July 26, 2000, Mr. Gallegos complained of pain when sitting due to the right gluteal injury. (Id.) The paralumbar muscles were noted to be tight on the right side and the right gluteal muscles were tender. There was no obvious hematoma although a large ecchymosis[1] was present over the right gluteal muscles. (Id.) Gait was noted to be normal. (Id.) Plaintiff has type 2 diabetes and this was found to be under poor control due to noncompliance after loss of insurance coverage. (Id.) Dr. Baca placed Plaintiff on Percocet[2] and

---

[1]Ecchymosis refers to large, confluent areas of extravasated blood. *The Merck Manual*, 781 (17th ed. 1999).

[2]Percocet is indicated for the relief of moderate to moderately severe pain. Oxycodone may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks such as driving a car or operating machinery. *Physician's Desk Reference*, 1037 (54th ed. 2000).

4

Flexeril[3] for pain and muscle spasms and gave him a work excuse through August 3, 2000. (R. at 127.)

Mr. Gallegos again saw Dr. Baca on August 2, 2000 at which time he was noted to be improving. (R. at 125.) Residual pain was found to be minimal and Plaintiff was able to walk without limping. Dr. Baca cleared Plaintiff to return to work. (Id.) On August 16, 2000, Plaintiff again saw Dr. Baca, continuing to complain of pain in the lower back. (R. at 124.) Mr. Gallegos also complained of pain in the dorsal feet and in the groin bilaterally and requested an MRI to rule out serious injury. (Id.) Dr. Baca could find no evidence of a neurologic or spine problem and felt the MRI would be normal. (Id.) He also indicated that Plaintiff became upset when it was suggested he could return to work and noted that Plaintiff left the office at a brisk pace with no evidence of gait problems. (Id.)

Plaintiff saw Dr. Richard Roche in August of 2000 for further evaluation of his pain complaints. (R. at 123.) Plaintiff related pain in the lower back as well as the right buttocks. (Id.) He also indicated parasthesias in the right lower extremity as well as urinary hesitancy and urgency. (Id.) Dr. Roche's impression was of low back injury with contusion, strain, and possible radiculopathy. (Id.) Mr. Gallegos was advised to have his MRI done and was given Darvocet[4] and Soma[5]. (Id.)

---

[3]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. Flexeril may impair mental and/or physical abilities required for performance of hazardous tasks, such as operating machinery or driving a motor vehicle. *PDR* at 1797.

[4]Darvocet is indicated for the relief of mild to moderate pain. Side effects include dizziness, sedation, nausea and vomiting, which may be lessened if the patient lies down. *PDR* at 1574-75.

[5]Soma is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. Patients should be warned that this drug may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks. *PDR* at 3160.

A bone scan completed in September of 2000 revealed minimal scoliosis of the lumbar spine at L5-S1 with right-sided curvature and slight increased uptake in the facet joints at L3 with the rest of the images within normal limits. (R. at 145.) As of October of 2000, Plaintiff was felt to be unable to work. (R. at 142-143.) He was seen at that time by Dr. Michael Woods, whose impression was of discogenic pain syndrome. (R. at 143.) Plaintiff continued to complain of pain, which seemed to increase with activity, as well as dyspareunia[6]. (R. at 142.) Dr. Woods gave Plaintiff Vicoprofen[7] and scheduled an MRI scan of the lumbar spine and pelvis. (R. at 143.)

This MRI scan, performed in November of 2000 revealed no abnormal findings in the hips. (R. at 141.) The L4-5 level showed moderate collapse with mild to moderate lateral recess stenosis, without major neural compression. (Id.) Level L5-S1 showed severe collapse with auto stabilization. (Id.) Dr. Woods's impression was again of discogenic pain syndrome with no evidence of major neurological compression. (Id.) He indicated Plaintiff was unable to return to any type of meaningful work at the time and again gave Plaintiff Vicoprofen as well as Oxycontin[8]. Dr. Woods wanted to try a transforaminal epidural injection at the L3-4 level on the left. (Id.) Plaintiff received the injection on November 30, 2000. (R. at 203-204.) Following treatment, he reported that his pain had decreased substantially. (Id.)

---

[6]Dyspareunia refers to sexual pain, usually during arousal, often caused by prostatitis or neurologic damage. *Merck Manual* at 1559.

[7]Vicoprofen tablets are indicated for the short-term (generally less than 10 days) management of acute pain. Hydrocodone can produce drug dependance of the morphine type and therefore has the potential for being abused. *PDR* at 1505.

[8]Oxycontin tablets are a controlled-release oral formulation of oxycodone hydrochloride indicated for the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days. Patients should be advised that oxycontin may impair mental and/or physical ability required for the performance of potentially hazardous tasks. *PDR* at 2539.

In December of 2000, Plaintiff again saw Dr. Woods and at that time complained of continued pain following the epidural injection. (R. at 140.) Dr. Woods determined Mr. Gallegos would be a good candidate for a two-level IDET procedure. (Id.) Dr. Woods anticipated maximum medical improvement, with permanent restrictions, three months after surgery. (R. at 139.) Dr. Woods also saw the need to decrease Plaintiff's heavy use of pain medications. (Id.)

Following the IDET procedure, Plaintiff reported improvement in his legs and fewer back cramps. (R. at 138.) He had discontinued the Oxycontin and Dr. Woods's plan was to discontinue Vicoprofen and continue the Darvocet. (Id.)

Plaintiff met with Dr. Ervin Hinds of New Mexico Pain and Wellness in March of 2001. (R. at 157-158.) He continued to complain of severe low back pain radiating into the legs and feet. (Id.) He also complained of a number of urologic problems. (Id.) Dr. Hinds felt Plaintiff was depressed and medication dependent. (Id.) Plaintiff was to discontinue Vicodin and was placed on Vioxx[9], Neurontin[10], and a fentanyl patch[11]. Dr. Hinds believed some S1 arthropathy might be present with some pelvic imbalance. (Id.) A urologic consultation was also recommended. (Id.)

Dr. Woods discharged Plaintiff from his care in March of 2001, noting that he could provide no further treatment for Plaintiff's condition. (R. at 135.) Mr. Gallegos's IDET

---

[9]Vioxx is indicated for the management of acute pain in adults. *PDR* at 1913.

[10]Neurontin is indicated as adjunctive therapy in the treatment of partial seizures. The drug has also been used to treat patients with chronic pain. Neurontin may cause dizziness, somnolence and other symptoms and signs of CNS depression. *PDR* at 2270.

[11]Fentanyl is indicated in the management of chronic pain in patients who require continuous opioid analgesia for pain that cannot be managed by lesser means. Fentanyl is a Schedule II controlled substance and can produce drug dependance similar to that produced by morphine. *PDR* at 1446-1447.

7

procedure was noted to have failed and he was found to have developed a full-blown chronic pain syndrome with a significant depressive component. (Id.) Dr. Woods felt that Plaintiff was capable of performing sedentary work, but did not believe Plaintiff would be able to return to his previous employment. (Id.) Plaintiff's chances for spontaneous improvement were found to be very guarded. (Id.) A chronic pain rehabilitation program was recommended as was a psychological evaluation. (Id.)

Dr. Hinds next suggested the epidural injection be repeated under flouroscopy to decrease pain and improve diagnosis. (R. at 155.) A urologic consult was again suggested due to continued urinary pain and urgency. (Id.) Plaintiff was placed on Oramorph[12] and it was recommended that he decrease Vicodin to one-fourth or one-fifth of the current dose. (Id.) The second epidural block was performed in May, 2001. (R. at 152-154.)

Plaintiff saw Dr. Pamela Black in May of 2001 for further evaluation of his continued pain. (R. at 177-179.) An EMG was scheduled to rule out possible radiculopathy with further epidural injections to be considered. (Id.) Plaintiff was found to be able to return to work with limited lifting, pulling and frequent position changes. (Id.) Dr. Black noted that the work was not to include any kneeling or squatting and that Plaintiff was not to operate any type of industrial motor vehicle. (Id.)

The electromyelegram was essentially negative. (R. at 175.) Plaintiff was noted to have good range of motion. (Id.) Plaintiff's urologist diagnosed him with prostatitis. (Id.) Dr. Black did not feel Plaintiff's urologic complaints were related to his back injury, although this was the

---

[12]Oramorph is indicated for the relief of pain in patients who require opioid analgesics for more than a few days. Morphine sulfate is a Schedule II narcotic. A patient may be at risk for developing a dependence to morphine if used improperly or for overly long periods of time. *PDR* at 2714.

opinion of his urologist. (Id.) Dr. Black again saw Plaintiff in June of 2001 for follow-up of his Functional Capacity Exam ("FCE"). (R. at 172-173.) The therapist performing the study indicated that Mr. Gallegos performed the FCE at a slow pace with guarded movement pattern and overt pain behaviors. Plaintiff's functional restrictions and limitations for lifting and postural tasks were felt to be self-imposed. (Id.) The therapist therefore felt unable to describe the reasonable limits of Plaintiff's current functional abilities. (Id.) It was however felt that Mr. Gallegos would be unable to return to his previous work. (Id.)

In July of 2001, Dr. Black's notes indicate that Plaintiff was reporting no change in his symptoms. (R. at 169.) He reported no problems with bowel or bladder functions, but did complain of continued urologic pain. (Id.) Manual muscle testing showed diffuse weakness bilaterally which was worse in the hamstrings. (Id.) Plaintiff's pain symptoms were found not to indicate a radiculopathy at L5-S1 and it was again noted that his EMG had been normal. (Id.) Dr. Black renewed Plaintiff's MS Contin and Vicodin and increased his Nortriptyline to improve sleep. (Id.) Dr. Black also felt a second surgical consultation was warranted. (Id.)

Plaintiff received this surgical consultation in July of 2001 from Dr. Richard Castillo. (R. at 161-162.) Dr. Castillo's assessment included chronic mechanical low back pain with no objective evidence of radiculopathy. (Id.) Dr. Castillo noted that Plaintiff's MRI from November of 2000 indicated no evidence of significant disc rupture or nerve root impingement at the levels studied. (Id.) Plaintiff's Waddell's signs were found to be 5/5 and consisted of tenderness, simulation, distraction, regionality, and overreaction.[13] (Id.) Dr. Castillo did not feel Plaintiff was

---

[13]Discrepancies may exist between a patient's subjective complaints of pain and objective medical findings. Waddell's signs help to measure this discrepancy and include tenderness, simulation, distraction, regional disturbances, and overreaction. The presence of three or more of the signs may suggest that the patient

9

a surgical candidate at the time and felt Plaintiff should remain on a conservative course of treatment. (Id.)

Mr. Gallegos again presented to Dr. Black in October of 2001 for follow up of continued low back and left groin pain. (R. at 216.) The Plaintiff continued to take Vicodin, Nortriptyline and MS Contin, as well as Ambien[14]. In addition to his previous symptoms, Plaintiff complained of left quadricep numbness at this appointment. (Id.) Mr. Gallegos was found to have reached maximum medical improvement as of August 13, 2001. It was noted that he could return to work with his previously listed permanent restrictions. (Id.)

Plaintiff began seeing Dr. Carlos Esparza for his continuing back pain in January of 2002. (R. at 235-237.) He complained at that time of low back pain with a burning sensation radiating into the legs and feet. (Id.) Plaintiff denied any past surgeries and was presently taking Morphine, Vicodin, Paxil[15], etodolac[16], nortriptyline and Glucophage. Dr. Esparza found that Plaintiff did not exhibit exaggerated pain behaviors and that his Waddell's signs were 0/5. (Id.) Dr. Esparza did not feel Plaintiff was a surgical candidate at the time but wanted to reassess the issue in several months. (Id.) Plaintiff was found to have reached maximum medical improvement. (Id.)

---

creates symptoms in order to get attention and remuneration as well as to avoid personal and work responsibilities. CWCE Magazine for Workplace Professionals, available at, http://www.cwce.com/feinbergarticles/symptommagnification.htm

[14]Ambien is indicated for the short-term treatment of insomnia. Hypnotics should generally be limited to 7 to 10 days of use. Ambien, like other sedative/hypnotic drugs, has CNS-depressant effects. *PDR* at 2885.

[15]Paxil is indicated for the treatment of depression, Obsessive-Compulsive disorder, panic disorder and social anxiety disorder. *PDR* at 3028.

[16]Lodine is indicated for the management of pain. *PDR* at 3263.

During the next several months, Plaintiff continued to have difficulty with back pain. (R. at 238-243.) Dr. Esparza placed Plaintiff on a program of aquatic therapy, which Plaintiff felt aggravated his symptoms. (Id.) Dr. Esparza also suggested attempting to reduce Plaintiff's pain medications. (Id.) In August of 2002, following an MRI scan showing significant stenosis at the L4-5 level as well as broad-based disc bulge and herniation, Dr. Esparza thought Plaintiff might benefit from a one-level decompressive procedure at L4-5. (Id.) The procedure was not expected to help Plaintiff's back pain, but rather to relieve the symptoms in his legs. (Id.) Dr. Esparza indicated that Plaintiff would be on a permanent sedentary, light duty work restriction following the procedure. (Id.)

Plaintiff was also seen by Urology Consultants of New Mexico in August of 2002. (R. at 244.) Studies showed profound erectile dysfunction as well as severe urinating and voiding symptoms. (Id.) Dr. Frederick Snoy opined that Plaintiff most likely had a neurogenic bladder related to his injury. A urodynamics study and cytoscopy were recommended to evaluate an appropriate bladder management program for Plaintiff. (Id.)

Plaintiff underwent a psychiatric evaluation in July of 2002 following a suicide attempt. (R. at 232-234.) Plaintiff had apparently taken an indeterminate number of amitriptyline tablets following an argument with his father. (Id.) He never became unconscious although he stated he did become very drowsy. (Id.) Plaintiff told Dr. Theodore Scharf that he had not intended to kill himself and that he had been depressed for some time due to chronic pain. (Id.) Dr. Scharf felt that Plaintiff most likely had a Pain Disorder associated with a General Medical Condition[17]. Mr.

---

[17] The essential feature of Pain Disorder associated with a general medical condition is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention. The pain causes significant distress or impairment in social, occupational, or other important areas of functioning. If psychological factors are present, they are not judged to have a major role in the onset, severity, exacerbation, or

11

Gallegos was not believed to be a suicide risk and it was felt that the amitriptyline overdose was an ill-considered impulsive act and not taken with suicidal intent. (Id.) Dr. Scharf did not see a need for treatment with antidepressants or formal psychotherapy. Instead, he believed treatment should focus on the physical aspects of Plaintiff's low-back problems. (Id.)

Following the ALJ's determination that Plaintiff was not disabled, the Appeals Council received additional medical evidence which became part of the record. (R. at 9.) Among the reports received were those of Dr. Frederick Snoy, Mr. Gallegos's urologist. Dr. Snoy saw Plaintiff in October of 2002 at which time urodynamic studies were performed. (R. at 255.) Dr. Snoy's impression was of significant bladder dysfunction with high bladder residuals and high voiding pressures. (Id.) It was recommended that Plaintiff begin an intermittent catheterization regimen. (Id.) Dr. Snoy also completed a workers' compensation form on Plaintiff's behalf at the end of October. (R. at 252-253.) Dr. Snoy opined that the diagnosis of neurogenic bladder rendered Plaintiff unable to work. (Id.)

Dr. Snoy saw Plaintiff on December 31, 2002 for continued analysis. (R. at 251.) The back operation was not noted to have improved Plainitff's voiding function and Dr. Snoy was not optimistic that improvement would be seen, but indicated that six to twelve months would be needed to make this determination. (Id.) Plaintiff was placed on intermittent catheterization which seemed to be resolving his pain and voiding issues. (Id.) Keflex[18] was given in the event Plaintiff developed a symptomatic UTI. (Id.)

---

maintenance of the pain. *Diagnostic and Statistical Manual of Mental Disorders*, 498-503 (4th ed. 2000).

[18]Keflex is indicated for treatment of genitourinary infections, including acute prostatitis. *PDR* at 959.

12

Dr. Esparza also completed a workers' compensation assessment for Mr. Gallegos in February of 2003, following his back surgery. (R. at 258-259.) Plaintiff was noted to be unable to return to work in any capacity at the present time, although it was estimated that he could return to work in July of 2003. (R. at 258.) Dr. Claude Galinas, Plaintiff's back surgeon, also completed an assessment in December of 2002 in which he found that Plaintiff could likely return to work in March of 2003. (R. at 260.)

Other records indicate Plaintiff was admitted to the hospital in January of 2003 for problems relating to hyperglycemia and elevated liver function. (R. at 269-270.) As of February, 2003, Dr. Richard Roche noted Mr. Gallegos's continued back pain and difficulties with urinary incontinence. (R. at 271.) Dr. Roche also stated that Plaintiff's blood sugars had been under only fair to poor control for the past year and that this was putting him at a high risk for infection as well as for renal, vascular, cardiac and ocular complications. (Id.) It was Dr. Roche's opinion that this would adversely affect Mr. Gallegos's ability to be employed. (Id.)

## IV.   DISCUSSION

In his Motion to Reverse and Remand, Plaintiff raises several allegations of error. Mr. Gallegos argues that the ALJ erred in his determination of Residual Functional Capacity ("RFC"), in his determination that Plaintiff was not fully credible regarding his limitations, and that newly provided medical evidence provides a proper basis for remand.

With respect to the ALJ's credibility determination, the ALJ found that Plaintiff's testimony and other evidence in the record did not credibly establish functional limitations to the extent alleged. (R. at 15.) It is well-established that subjective testimony alone that a claimant

13

has symptoms cannot establish a finding of disability. *Gatson v. Bowen*, 838 F.2d 442, 447 (10th Cir. 1988). Objective medical evidence must establish an impairment and statements regarding the intensity and persistence of symptoms must be consistent with the medical findings and signs. *Id.*

When determining the credibility of pain testimony, the ALJ should consider factors such as the levels of medication and their effectiveness, the extensiveness of attempts to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility, the motivation of and relationship between the Plaintiff and other witnesses, and the consistency or compatibility of non-medical testimony with the objective medical record. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).

The Tenth Circuit generally treats credibility determinations made by an ALJ as binding upon review. *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983). The Court has previously stated that credibility determinations are particularly the province of the finder of fact and the Court has declined to upset such determinations when supported by substantial evidence. *Diaz v. Sec'y of Health and Human Svcs.*, 898 F.2d 774, 777 (10th Cir. 1990).

In the present case, the ALJ discussed the records of a number of physicians who indicated that Plaintiff exhibited a great deal of pain behavior during examination and that Plaintiff scored positive on all five Waddell's signs during one exam. (R. at 16.) The ALJ also referred to office visits where objective medical findings were minimal and where Plaintiff's physicians cleared him to return to work. (Id.) As such, the ALJ's determinations with respect to Plaintiff's credibility were supported by substantial evidence and the decision of the Commissioner should be

upheld with respect to the ALJ's credibility determinations.

Plaintiff also argues that the ALJ erred in his evaluation of Residual Functional Capacity. The ALJ found that Plaintiff retained the RFC to perform a limited range of light work. (R. at 18.) A claimant's RFC is determined by what that individual can do despite his limitations, and it is based upon all the relevant evidence including medical records, observations of treating physicians and others, as well as on a claimant's own descriptions of his limitations. 20 C.F.R. §§ 416.945(a)-416.946. Plaintiff contends that the ALJ's RFC determination was not supported by the evidence because the ALJ ignored the diagnoses of Plaintiff's physicians, because he did not consider the side effects of Plaintiff's medications, and because he did not account for Plaintiff's need to lie down frequently.

Plaintiff's contentions as to the ALJ's RFC determination must be rejected. An examination of the ALJ's opinion reveals that side effects of medications and Plaintiff's need to lie down during the day were considered by the ALJ in conducting his analysis at step five. (R. at 19.) The ALJ's questions to the vocational expert accounted for limitations in concentration, persistence, and pace due to the effects of pain and of medication. (Id.) The ALJ's hypothetical also included the need to alternate frequently between sitting and standing. (Id.)

Plaintiff is correct to point out that the VE testified that the listed jobs would be eliminated for an individual who needed to lie down frequently during the work day. (R. at 295-296.) However, this hypothetical sets forth limitations which the ALJ found did not apply to the Plaintiff. A vocational expert's testimony is not binding on an ALJ if it incorporates limitations that the ALJ finds do not apply to the Claimant. *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir.

1999). As such, the ALJ was correct not to incorporate the VE's response to this hypothetical into his decision and Plaintiff's argument on this point must be rejected.

Plaintiff further argues that the ALJ ignored Dr. Theodore Scharf's diagnosis of Pain Disorder. An examination of the ALJ's opinion reveals that he did consider Dr. Scharf's conclusions. (R. at 16-17.) Plaintiff, it would seem, urges this Court to conclude that the diagnosis of Pain Disorder precludes him from performing any kind of substantial gainful activity. Examination of Dr. Scharf's records does not reveal any conclusion about Plaintiff's ability to work. (R. at 232-234.) As such, Plaintiff's argument that the diagnosis of Pain Disorder renders the ALJ's RFC assessment erroneous must be rejected.

Finally, Plaintiff argues that the additional evidence submitted after the ALJ's decision renders that decision erroneous and that the case should be remanded to allow the ALJ to consider this evidence.

With regard to the exhibits submitted by Plaintiff after the Commissioner's final decision, I find that this Court may not consider such evidence in deciding whether to remand the case. While new evidence may be taken following the Commissioner's decision, such evidence may be considered only upon a showing that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. *Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991). 42 U.S.C. § 405(g). Plaintiff claims that good cause exists for the failure to include the new evidence because the evidence did not exist previously. (Doc. 13.) This does not constitute good cause under the law of this Circuit. *Hargis*, 945 F.2d at 1493. To find a remand appropriate, I must normally determine that there is a reasonable possibility that the new evidence

would have changed the Secretary's decision. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003)(quoting *Wilkins v. Sec'y of Health and Human Svcs.*, 953 F.2d 93, 96 (4th Cir. 1991)). Implicit in this requirement is that the proffered evidence relate to the time period for which the benefits were denied. *Hargis*, 945 F.2d at 1493 (quoting *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985). Plaintiff's new evidence does not relate to the time period for which benefits were denied, but rather, to the period following the Secretary's decision. *See* 20 C.F.R. § 404.970(b). Hence, this evidence will not be considered by this Court in evaluating Plaintiff's Motion.

With regard to the additional evidence submitted to the Appeals Council, such submissions are expressly authorized, even in the absence of a good cause requirement. *Id*. Such submissions become part of the administrative record and this Court must consider the submissions to the Appeals Council in evaluating the Secretary's decision for substantial evidence. *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994).

An examination of the evidence before the Appeals Council raises a question as to whether the Secretary's decision was supported by substantial evidence. *Hamilton*, 961 F.2d at 1497-1498. The records in question include further evaluation of Claimant's urologic dysfunction (R. at 251-259), further evaluation of Claimant's back problems, including surgical records (R. at 260-268), and records involving treatment of Claimant's diabetes. (R. at 269-271.) Evidence is material to the determination of disability if there is a reasonable possibility that it would have changed the outcome. *Threet*, 353 F.3d at 1191. Mr. Gallegos's new evidence meets this standard by reasonably calling into question the disposition of the case in light of the ALJ's

determination of nondisability. *Id*. Because I find that there is a reasonable possibility that the new evidence would have changed the ALJ's decision, this case should be remanded to the Commissioner for further proceedings consistent with this opinion.

## V.     CONCLUSION

Upon review of the evidence presented in this Motion to Reverse and Remand for Rehearing, this Court has determined that there is a reasonable possibility that the ALJ would have reached a different conclusion had he been able to consider the evidence before the Appeals Council. As such, the case must be remanded so that the ALJ may consider this evidence. Accordingly, Plaintiff's Motion to Reverse and Remand for Rehearing is **GRANTED**.

**A JUDGMENT CONSISTENT WITH THIS OPINION SHALL ISSUE.**

_____
**LESLIE C. SMITH
UNITED STATES MAGISTRATE JUDGE**